And we are going to go on to the last case of the day, which is number 21-3075. Castellas Holding v. Federal Insurance Company Mr. Hacker Hello. Good afternoon, Your Honors. John Hacker for Appellant Federal. No relation as far as I'm aware from this morning. Well, okay. Thank you for that clarification. Your Honors, Astellas wants insurance coverage for an intentional kickback fraud on the Medicare program. Astellas used innocent third parties essentially as dupes by inducing them into submitting false claims to the government, so the government would pay for Astellas' extanty product. If liability insurance covered such schemes, the moral hazard would be indefensible. Fraudsters could use insurance to retain the money they obtained through their kickbacks, thereby encouraging similar frauds on the government. Now sometimes, to be sure, in other fraud cases, the victim may suffer damages that are incidental to the defendant's gain, losses the defendant did not specifically intend to cause. Insuring those kinds of unintended losses does not necessarily incentivize fraud, because those losses are not the reason for the scheme. Now this idea, of course, that the government was damaged by the full measure of any expenditures is a legal fiction, isn't it? Because the drug was worth something to some patients, wasn't it? Well, we don't know exactly that record. I wouldn't use the phrase legal fiction. It's the premise of the statute that a false payment was made every time because there was not a misrepresentation about underlying the payment that Astellas induced. And so the payment was incorrect, and so the government should not have paid the claim, because a condition for making the payment, and this is in the Rogin case, is an accurate statement to the government. So the underlying facts, whether the medicine helps or not, are just categorically beside the point. The claim to the government is a false claim because it rests on a false premise. I just want to make two points. Could you hold over just a second? Because I just want to get this clear in my head. In the brief, you agreed that coverage for fraud remedies that are strictly compensatory would be allowable. But, I mean, doesn't that have the same moral hazard problem when that also provides the wrong incentives to pharmaceutical companies? So not quite, Your Honor. And that's the point I was making in the introduction. There are certain kinds of schemes where the damage is completely incidental. It's not what the fraudster was looking for. It's not the money the fraudster was trying to get. The fraudster didn't care about the harm to the victim. In that situation, that harm is not the reason the fraudster is doing it. So making the fraudster compensate for that doesn't incentivize more of that, because that's not the reason they're there. Mr. Hecker, this is helpful. Can you give three common examples of that? Just come up with three off the top of your head. Sure. So I can give you straight out of the cases. Level three identifies... Securities fraud. I'm sorry? Securities fraud. Right, that's one. The city of Genoa case is another one. Tax revenue. Yeah, where the tax, they got something for the tax, but the plaintiff was complaining that when you got your benefit that you tricked everybody into giving you, it also hurt us, and the defendant didn't care about the harm to them. So those are two.  I'm sorry, I just don't have the facts at the ready. But it's not that uncommon to have that kind of situation. Commonality doesn't matter. I mean, I think it is an exception. I think it's right that when it's incidental, that's a situation where it's not covered. I think the basic rule is that fraud, when you're engaged in a scheme to get money from somebody, that's the reason you're doing it, and then you have to give the money back. I think that's heartland moral hazard problem, and it's also restitutionary. I want to just talk about two reasons that are interrelated but that are slightly separate as to why this remedy can't be insured. First of all, it's that insuring intentional kickback schemes, a particular type of fraud, would incentivize them. We know that public policy bars insurance for settlements requiring fraudsters to return to the victims money the fraudster took from them. If insurance covered that payment, it would encourage the fraud. That's what Level 3 says. That's what Ryerson says. That's what Five Star Manager says. That's what Franklin Park said. It's a very consistent rule this court and the Illinois courts have recognized. It doesn't apply to all fraud remedies, to be sure, for the reasons I explained. But in a kickback, the victim's loss is essential to the scheme. It's the intended purpose. Hacker, excuse me. Could you talk about the consequences of the SIENTA requirements of the False Claims Act, which refer to, if I remember correctly, deliberate ignorance and reckless disregard.  And in particular, what that says to us about moral hazards, since reckless and reckless wrongful conduct can be insured. Right. It's such an important question because it's one of the differences between this case and Call 1, one of the cases that Estellas relies on. The False Claims Act encompasses frauds that are based on recklessness and other kinds of state of mind. This is a False Claims Act that's predicated on an anti-kickback statute violation. The anti-kickback statute is very specific. You have to intend to induce the payment by the government. And if you don't establish that intent, there's no liability. It says willing and willful, right? Under the anti-kickback statute? Yes. I believe that's correct. Yeah. But it's understood as, you know, an intent to induce the payment. Well, let's stick to the statutory language, which is about as high as you can get. The problem, the biggest problem that I have, we have several, but you've briefed the whole case as if plaintiff is guilty. Okay. They've offered evidence. We cleared this with inside, outside counsel, left and right. The government said we'll start at $482 million in damages, and that could be trebled, right, under the FCA. And settled for $100 million less than a dime on the dollar under that kind of an approach. And your policy includes the final adjudication requirement for the exclusion for various kinds of intentionally wrongful conduct. Illinois doesn't seem to have a problem with that final adjudication requirement. Why shouldn't we just follow that ourselves? So there's a couple things packed into your question to work backwards. For the same reason this court didn't follow it in level three, explicitly addressed that and said that that exclusion wasn't controlling, in part because the second reason is you can't contract your way out of public policy. If there's a moral hazard here that's going to encourage destabilization and fraud on the Medicare program, an insurance company can't offer to incentivize that by covering it when it happens. It's that simple. So you can't ever contract your way out of that moral hazard, that public policy problem. The third point is, as the Sabol case in the 11th Circuit I think nicely explains, you don't even get to an exclusion until you establish a loss up front, and there's no loss here for various reasons we can discuss. So the exclusion isn't even triggered. Well, I mean, that's parsing things a little too finely, frankly, because they're all addressing the question of moral hazard, right? And I take it that the state commissioners approve DNO liability policies with these final adjudication requirements. They're pretty common, right? Oh, yeah, absolutely. What does that tell us about public policy of the states that approve them? Well, I don't think we're in a situation like Delaware where the Delaware statute really expressed public policy by allowing for DNO insurance for a certain kind of fraud. The fact that this is approved, I don't think any court, and I haven't heard this argument from Estellas by any stretch, that the existence of that exclusion itself proves that the state, Illinois or any other, doesn't have this public policy, which this court recognized. Again, level three had the same exclusion. It's addressed by this court. It said it can't be right, that that makes a difference. I think it was true in Ryerson. So it's not that you're precisely right that it's a fairly common provision in DNO policies. Despite that, this court and others have been consistent that we will not allow insurance for schemes like this that would be bad for the public, would encourage frauds on the public, like this would encourage frauds on Medicare. Well, I've got to tell you, the encouragement of fraud here, frankly, seems a little bit of a stretch. You've written a policy for $10 million on a $100 million settlement. Well, I understand that, but the public policy I don't think applies based on a particular scheme. The idea is that the public policy exists because we don't want insurers writing it. We don't want policyholders seeking it because you never know ex ante what the schemes are going to be. The point is it's a basic rule, a basic principle that you don't want insurance to cover to protect a fraudster so that it's win-win for them to engage in the scheme. Suppose the settlement here had been for $20 million. What happens to your argument then? Then it starts to look like, you know, incidental costs of doing business. Well, I don't know the $20 million. I mean, we would have a debate and there would be a record over $20 million. Compared to the government theory that it would take you over $1 billion. I mean, that would be an argument in a case like that. That's not the case we have here. Again, Level 3 recognized, and I don't disagree with Your Honor, if you have a nuisance settlement, that is an exception to this principle. I don't think there's any evidence, and Estellas has not argued that this is a nuisance settlement. This is $100 million, you know, $50 million paying the government back and $50 million in penalty. Well, they are arguing, in essence, we don't need to wrestle the merits of the whole case to the ground in order to seek the insurance coverage that we bought and paid for. And I don't know if you've come across the Curmudgeon's Guide to Law Practice and the definition, it was actually written by one of the opposing counsel's former partners, but the definition of Director's and Officer's Liability Insurance. I'm paraphrasing here. It's something like a contract in which you pay an insurance company for the right to sue it later. And that which leads me to my next question, in all seriousness, which is what's the rule that you are asking us to apply here? It doesn't seem to be all FCA cases. It doesn't seem to be, or maybe it is, all anti-kickback statute accusations or only those that settle for more than nuisance value. But this all looks like an invitation for litigation of every single individual coverage issue. So I think it's the opposite, Your Honor. With respect, I think if there's a rule or a sort of conclusion, an overall conclusion, it's not really a legal rule, it's the kickback statutes or kickback remedies. Paying back the government money you took, that can't be insurable. I think this Court has all but said that in the Level 3 line of cases. That's what a kickback is, and there's no broad consequences to that other than saying you can't get insurance for a kickback. Don't engage in a kickback. It is not required. This is a very important point, Your Honor. It does not require the court to get into the merits. I agree with that. I agree that we're not supposed to be re-litigating what really happened and how culpable they were because under U.S. Gypsum in Illinois, in this Court's case in Santa's Best, when you have a settlement, you don't just take the insurance word for it and say, well, we didn't do it, we want to fight again. What you do is you look at the settlement and you determine what the primary focus of the claim was that was settled, and the primary focus of the claim was everything I just said. That's why the DOJ sued. That's why the DOJ wanted millions of dollars. That's why the DOJ got $100 million. Well, it sounds to me then like what you're saying is the bright line rule you want us to apply here is to say no coverage for False Claims Act settlements based on allegations of anti-kickback statute violations. Is that right? Well, I'm not just purely allegation. You'd have to do, Ruth, Your Honor, that's just part of the case law that you have to analyze whether it's a nuisance settlement. But $100 million I don't think is realistically a nuisance settlement by any measure, and Estellas hasn't argued that. So I think there's always that piece, but that's just part of the Santa's Best analysis. That's part of the case law. There's that little carve-out exception. But, yes, the basic principle, the basic rule, is the rule stated in Level 3 as applied to kickbacks. When you have a kickback scheme that should not be, we submit, is not insurable because allowing insurance for it, it's exactly what the Level 3 principle is. That's what it says. That's what this Court has repeatedly said. Why isn't it? I know you're not going to like this, but you can push back. When I look at this and I think of the final adjudication provision, it really surprises me that this question is as unsettled as it seems to be in 2022 as we're arguing here. And the back and forth on this, why isn't the fair conclusion, I mean, settlement, the language settlements in the policy, so we know that there has to be something that is a covered settlement, et cetera, why don't we, it's ambiguous. It's just not clear. And, you know, the better way to resolve the ambiguity is in favor of the insured. So a couple of points. I would say, first of all, that's the way you resolve language if you're trying to figure out how to apply the exclusion. That's not really the issue here. The issue here is whether, first of all, public policy applies and should prohibit enforcement. But also. It's a little bit policy, isn't it? We're trying to figure out what is in and out of this term loss in terms of coverage. No, I think both. I think the loss one does implicate the question of the policy language read together. And I think Sabol has it right in saying the first question is whether it qualifies as a loss when it's restitutionary in character. It's not an answer. As this court already said in level three, it's not an answer to say that that exclusion exists. You have to figure out if it's restitutionary in character. Yeah, that's the look through. Right. So there's that. But yes, public policy stands above that because parties can't contract out of public policy. It would be. I've never heard an argument that one can. I do think it's helpful, Your Honors, to think about. I don't know if I have time to get through this. But there's basically three possible remedies that one can imagine forgetting the labels. One end of the spectrum is pure disgorgement, true disgorgement where it's just money you made off the scheme. Everybody agrees, I think, that that's not insurable. Those remedies are not insurable. The other end is pure damages, which we've already discussed, where it's incidental to what the defendant was trying to do. The middle spectrum, I think, is what we have here, which is really where I think it's heartland restitution where the defendant is repaying money that it took from the victim. That has to be, even though it's compensatory, that's Estella's sort of principal argument is, well, this was compensatory because it paid the government back. Therefore, it has to be insurable. But that's not enough. We know from, that happened also in Ryerson. It happened in Franklin Park. It happened in Five Star Managers. Somebody was paid back, but because they're being paid back money the defendant took, then it's proceeds of fraud and it's not insurable. Then the issue, of course, is, is that true under the anti-kickback statute because you have a middleman? That's the only, I think, difference between this case and that whole level three line of cases is that you have a middleman. So it's not like Estella's itself reached into the pocket of the government and took the money back. It set up a scheme where effectively the same thing would happen. That's the premise of the statute is, effectively, the party that induces the fraud got the money because that was the whole point, and because that's the whole point, we're going to allow the government to go after the party that induced it as if they were the party that took it, and that puts this case squarely into that level three set of precedents. Thank you very much. Thank you very much. Okay, Mr. Lawn. Good afternoon. May it please the court. Federal's appeal fails for one simple reason. Federal has presented no evidence that the settlement at issue here constitutes uninsurable discordant, nor, as Federal now tries to recast the issue on appeal, was it restitutionary in character or the proceeds of fraud. Mr. Lawn, is it possible, do you think, for both things to be true? In other words, the settlement amount that was for the government damages and allowing Estellas to recoup the amount is against public policy. If there were a correlation and evidence of such, that might be the rule, for example, under level three and local 705 and all of the cases where this entire doctrine begins in Illinois and in this court. The problem... Yeah. Go ahead. I'm sorry. The issue here is that there is no proof of what profits, if any, Estellas made by virtue of what Mr. Hacker tries to describe as a scheme. There's no proof that any of those profits resulted in any way from what were, and everybody has to acknowledge, donations to charity patient assistance foundations that paid patients co-pays. There's no proof in the record whatsoever that any of those payments led to $1 in the coffers of Estellas, as they like to describe it. And so what Federal asks this court to do, because it has a gaping hole in its proof, they ask this court to simply assume that what the government paid third parties, specialty pharmacies or retail pharmacies, what the government paid pharmacies, is the same as the profits that Estellas got. That's simply not true. And even if one could prove it, there's no proof in the record here establishing it. And the failure of proof... Are you talking about just the difference between manufacturer to wholesaler and wholesaler to the government in price? No. The way the sales transactions work here is important. It may or may not be dispositive in the context of the arguments being made, but the way it works is significant. Estellas sells its Xtandi to specialty pharmacies. Those specialty pharmacies in turn sell the drug to retail pharmacies and hospitals if they have pharmacies. Then what happens is the patient comes in with a prescription. They have a prescription for Xtandi. This is a drug of last resort, so it's something that doctors only prescribe if there's a very bad metastatic cancer that's resistant. They come in with a prescription. They go to the pharmacy or to the hospital, and they get that prescription filled. And that pharmacy, that retail pharmacy or hospital, if that's the case, bills Medicare for that amount, and Medicare pays that amount. So it is absolutely so. So yes, if a federal wanted to prove that in fact the profits are the same as Medicare's losses, it could have tried to do that. It could have gotten an expert. It could have run profit analyses. It could have done all kinds of things to try to trace through what we got from specialty pharmacies and how that traced back to prescriptions. It did none of that. And the reason you're focused on profits and a lack of evidence in the record on measuring profits is because that's what you think is the ultimate inquiry here in terms of insurability. Yes. In other words, it's an ill-gotten gain. It's got to be you kind of coughing up something, an ill-gotten profit, restitutionary in nature. Absolutely. I couldn't have said it better myself. The rule in Illinois is a disgorgement rule. The rule says if you disgorge something to which you never had a right to begin with, it's not insurable. That's the real dividing line, right? Because Mr. Hacker says, well, because of moral hazard and all that, it's also got to pick up ill-gotten revenue because the way the statutory scheme works is each dollar of the payment, if it were adjudicated, you'd say it's in its entirety a prohibited payment. Right? If you went to liability on it, just hypothetically. Yeah. If the government had proven its claims and it was litigated in that underlying action that there was a scheme that the government had proved, causation, damages, and all the things it has to prove, the government just can't get in there and say, look, you paid money to a patient assistance foundation, therefore Medicare was damaged by that amount. And the AKS, right, and the FCA, it would have to prove every element of that. And so this is the skip, this is the step that federal completely skips over. And there's reasons for that. Below, what federal argued was that the settlement itself constituted disgorgement. The district court, in a very long and thoughtful opinion, didn't buy that argument. And it didn't buy it because it's wrong. The FCA doesn't allow disgorgement as a remedy. And when the remedy claimed is not disgorgement, they can't come here and argue that in fact it is disgorgement and therefore uninsurable under Illinois law. Well, that kind of goes back to Judge Rovner's earlier question. Are these two things mutually exclusive? Exactly. In terms of, is this kind of scheme one where damages, in essence, equal, compensatory damages equal receipts to the defendant? Absolutely not. And you can find wisdom about that issue in the cases that federal relies on. Because in those cases, the loss and the gain are provably the same. And all of this starts with the local 705 case, which is an Illinois case. In that case, the pension plan sought a return of funds from another pension plan saying that you took funds that should have been in this pension. And the remedy was returning those funds to the pension. And so what the court said, correctly, is you never had a right to those funds. They weren't yours to begin with. Well, the government's never made an argument that we didn't have a right to sell Xtandi to specialty pharmacies. It's never said we didn't have a right to make money off Xtandi. It's never said any of that. And Level 3, although it goes off on some detours on other things and it's a securities case, simply picks up on that small thread in the local 705 case. In Level 3, what's key to understand is that the damages claimed by the plaintiff in the securities case were exactly the same as the defendant's gains. Why is that? That is the case because the allegation there was that the shares were purchased under false pretenses or said, from the other perspective, sold under false pretenses. The plaintiff claimed that Level 3 failed to disclose to it material information that it was going to offer an IPO. And because it failed to disclose that, the plaintiff said, you underpaid for my shares. And what I want is the value the shares would have had had you disclosed the information to it. In that case, the very loss equals the gain. So in other words, if the truth were in the market, the compensation to me would be greater. It could be. That is exactly the theory. And that is Securities Law 101, of course. I have a question, please. And it's this. You stated that not a single extendi prescription, that there's no evidence in the record that not a single one wasn't medically justified. But to me, that is a different question than whether doctors and their patients would have chosen that drug from other treatment options without the copay assistance. You can imagine, I think, that there are many situations in which a particular drug is medically justified. But the physician prescribes something else because she knows the patient can't afford the copay. Am I not right? I'm not a doctor, and I can't play one on TV. But yes, that generally sounds correct. But I think here, what Federal, in their brief, essentially argued that one of the reasons we should be called a fraudster by them is because we were promoting the use of our product for medically unnecessary or inappropriate situations. What we said in our brief is simply, there's not one shred of evidence in the record for any of that. It's just name-calling. And that is basically what is going on here. The policy, I mean, they call us a fraudster. They compare us to a three-card street hustler playing three-card money. Just as Judge Scudder said, they have the opportunity to prove that we are a fraudster by final judgment. But just saying it over and over as a mantra in a brief does not make it true. It's just name-calling. Federal policy contains a specific way they can prove that something is uninsurable. It specifically excludes coverage for deliberate, fraudulent acts and the gaining of illegal profits. They could have tried to prove either one of those things in the district court. They chose not to. Why they did, I don't know. Probably because they couldn't. And the reason they couldn't is because there was no evidence actually put together by the government that we gained any illegal profits because it didn't care. The government's claim under the False Claims Act was based exclusively and only could have been based on the losses the government incurred, not the gains, if any, that Estellas got. And that's why there's no proof in the record that Estellas got a nickel, because the government didn't have to prove it and never tried to prove it. I've been wondering why Estellas stopped donating to the ARI funds in 2013 and 2014. I don't know that that specific evidence is in the record, but it is correct that it stopped donating. And those funds essentially transferred those monies into these broader funds that had existed before. And one other question. You know, you called that opinion in U.S. Exerell-Taylor v. Gabelli the leading case on the issue. Why would that opinion from the Southern District of New York be the leading case? And particularly, why would it be the leading case in the Seventh Circuit? Because there's no other case that has found that disgorgement damages are insurable under the FCA. And the federal certainly doesn't point to one. It is the leading case because it went extensively through the issue and made that conclusion. By the way, there is a recent District Court decision from here in Illinois that found the same thing. It's the Call 1 case recently decided. Now, that involves Illinois' equivalent of a False Claims Act. But in that case, the court went through the exact same analysis and concluded that just like the Federal False Claims Act, the Illinois State False Claims Act does not allow disgorgement as a remedy. It allows compensatory damages. And that's cited in our brief. I'm sorry, do you have a question, Your Honor? No, I'm talking to myself. But I was listening, so that's good. That's where I am at this point. Go ahead. As I pointed out, there's simply no evidence in the record supporting any of Federalist's claims. They can't prove that Estellas actually was a fraudster. They just keep saying it over and over. But repetition is not adjudication, and they could have had that issue adjudicated. On the damages side, they can't point to any evidence whatsoever that a particular profit gained by Estellas resulted from a donation to one of these ARI funds. They want you to simply assume that as if they don't have to prove it. But in a case where they're arguing for uninsurability, they have the burden to prove that something is uninsurable as a matter of law. And it's not a light burden. Courts in Illinois have been instructed to invalidate otherwise valid contractual provisions sparingly. And when the Illinois public policy is clearly established, and how is it clearly established? The Constitution, statutes, and longstanding case law, they have none of that. There is no, other than the disgorgement rule per se, which this isn't because there isn't a disgorgement remedy under FCA, they have no argument, no case, no holding that the type of situation here is excluded from coverage under Illinois law. And the types of cases they rely on, Local 705, which is a pension case. St. Paul-Franklin Park, that's also a pension case. In that case, what is being given back is the very thing that was taken dollar for dollar. In the Ryerson case, the Ryerson sold stock to EMC and it failed to disclose to EMC that it had, that there was material adverse development with a customer. Ryerson sued and said, look, if you had told me about this, you committed fraud, you can see this information, if you had told me about this, I would have paid less for your stock. What was the settlement in that case? A purchase price adjustment. It was literally a give back to the plaintiffs of the amount of the overage of the stock price that EMC paid. That's not this case. Can I ask you, I don't know, what's the rule you want us to apply? So I think the first rule, which is the only clear rule in Illinois, that if an underlying case involves disgorgement as a remedy, we all agree that that's not covered. This isn't disgorgement because the FCA doesn't allow it. If you assume that level three  or a gloss on that rule, it is only that when you return fraud proceeds, or it's sometimes referred to as a net benefit, that if you give back the net benefit of your fraud, that's not covered. The problem that federal has, it would actually have to prove that what we gave back was the net benefit. But they can't point to any benefit at all because there's no evidence in the record at all of $1 of profit that Estellas made for these donations. We have the description of the arrangements. We have the evidence from your executive who's in charge of this, that in response to the good news about sales going up, it looks like the program's working, right? I mean, there is an email that they refer to in which he says good news, yes. Yeah, and I mean, that's what one would expect, right? In the ordinary course of business and the way the Medicare program works. When you say one would expect, are you saying that if one helps with co-pays that drugs might be sold? Yeah. Yes, I think that's correct. But in order for that to be an uninsurable disgorgement or the net benefit, they'd actually have to prove what the quantum is. The link between a donation to an ARI fund, which is all that it's issued, these ARI funds, and the actual profits that Estellas received. I see my time's up. Do you want me to finish that answer? And the reason that federal didn't prove this, there are really two reasons. Number one, there was no proof in the record from the McGovern case because the government didn't have to prove it and didn't try to prove it. Number two, federal itself never tried to prove it because it put all its eggs in the disgorgement basket. They basically tried to convince the district court that this was uninsurable disgorgement as a matter of Illinois law. And now that they lost that, they're retooling the argument to make this net benefit argument. And the problem with the net benefit argument is you actually have to prove what the net benefit was, and there's literally no proof in the record of even what Estellas' profit margin was on this drug. In that circumstance, unlike Ryerson, unlike Level 3, unlike Local 705, there's no basis for this court to do anything... And you're going to that finer measurement, I think Mr. Hacker would say, he can correct me, is the net benefit is the ill-gotten revenue. Right. But what is that amount? There's no proof. Well, I think... Well, at least a portion of it was... At least $10 million of it was ill-gotten revenue, you know, the limit here that's covered. But I think the point I'm hearing you make is ill-gotten revenue is not the measuring stick. It's...  Ill-gotten revenue is not the same as disgorgement. Right, disgorgement... It can be, but it may not be. And that's why I refer to Level 3. In Level 3, the exact amount of the ill-gotten benefit was the disgorgement. Well, because it's... OK. And here, the problem with... The problem the federal has is to prove... Because it's reflected in the sheriff's... To actually prove that we disgorged something or we gave back the ill-gotten benefit, they'd have to prove what the benefit is. And there's no evidence in the record whatsoever as to what the benefit is. They simply want the court to assume that there was a benefit and to infer the amount and to infer that it was more than the settlement or more than the payments we made to these charity funds. We put $16 million into these funds. They'd have to prove that we somehow reaped benefits from that in some specified amount, and that amount constituted uninsurable disgorgement, and they haven't done any of that. OK. Well, thank you very much. And we're going to bring your friend back up, Mr. Pepper. Thank you, Your Honor. Just a couple of points to follow up. Mr. Long always gets mad when I say fraudster, but it's not my term. It's the United States government term. This is how they describe the scheme that they committed. The subsidies present all of the usual risks of fraud and abuse associated with kickbacks. What did they say when they announced the settlement? DOJ described the FCA as, quote, one of the most powerful tools at its disposal in combating health care fraud. That's what this statute is about, and that's what they paid money for. Nobody has to get back into the merits of it, because that is the presupposition both of the statute and the liability that's at issue. I do want to address Gabelli, because I do think, Judge Rovner, it's an important case. All that case says is that you can't get, under the FCA itself, the separate remedy of disgorging separate profits. That doesn't answer the insurance question of, suppose Estellas had submitted a false claim directly to the government itself and just gotten the money back. I don't think Mr. Long could possibly be up here saying that that FCA remedy, when they were required to pay it back, is insurable. It's classic proceeds of fraud. That's the easiest case. The only interesting thing about this case that makes this different is the fact that you have a middleman. That's the only thing different from going into the government's pocket itself. You couldn't get disgorgement that when the government gets that money back, that's a repayment of the proceeds of fraud, and it's clearly uninsurable. What's different about the fact that there's a middleman? The answer is nothing. It's not about profits, as my example just established. There is a benefit. That's not disputed, really. Mr. Long may try to deny it, but the evidence is overwhelming. It's cited in our brief that they got a benefit. There's no requirement here of tracing. There's no requirement of the FCA that you establish profits, because that's not the issue. What the AKS establishes is basically a postulate that the party that induced the fraud got the benefit, and so the AKS says, you government can go after that party and get the money back, because the presumption, which I think is essentially conclusive under the statute, is they've got your money, so go get it back from them, because you can't go after the innocent party, obviously. Go after the party that intentionally set this up so that somebody would reach into the pockets, and then, yes, you know, there'd be a normal process of distribution, and it would end up in the fraudster's pocket. That's exactly what was going on, not kickback, but a case Mr. Long mentions, five-star managers. Again, there's no profits analysis there. The defendant just had the plaintiff's money, and they were made to pay it back. Nobody asked how much profit did the defendant make, what were the costs the defendant incurred in keeping the plaintiff's money. They just had to pay it back, and that was uninsurable. There's no requirement that it be either the exact dollars or the equal dollars. Level 3 itself explicitly says, it says in the holding of the case that part of the money, the defendant had part of its profits were the money that was taken from the plaintiff, and that's what was being paid back, and that's what was uninsurable. The same is true here. No court I'm aware of anywhere has ever held that a kickback remedy like this one or any other kickback remedy is insurable. This is not a broad holding we're asking for. It's a simple, straightforward rule that at least in a scheme like this, probably true of all kickback schemes, but certainly in a scheme like this where the record shows the defendant got a benefit, returning that benefit, paying the government back, is not and should not be insurable. Thank you. Well, thank you so much to both of you. Thank you for your very fine briefs. Thank you for your arguments. The case will be taken under advisement.